## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Debra Jacobson,

     Plaintiff,

v.

Commissioner of Social Security,

     Defendant.

Civil No. 08-4666 (PJS/JJG)

**REPORT
AND
RECOMMENDATION**

---

JEANNE J. GRAHAM, United States Magistrate Judge

This litigation comes before the undersigned on the parties' cross motions for summary judgment (Doc. Nos. 35, 39). Stephen J. Beseres, Esq., is representing plaintiff Debra Jacobson. Lonnie F. Bryan, Assistant U.S. Attorney, is representing defendant Commissioner of the Social Security Administration. The motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636(b) and Local Rule 72.1(a).

Ms. Jacobson (Jacobson) filed for disability insurance benefits from the Social Security Administration (the SSA) on June 30, 2006. Jacobson asserted she could not work because of chronic pain, which was variously caused by fibromyalgia, by endometriosis, or by bursitis and tendonitis in her neck and shoulders. After the SSA denied her application initially and upon reconsideration, Jacobson asked for a hearing before an Administrative Law Judge (ALJ). In a decision on June 4, 2007, the ALJ ruled that Jacobson was not disabled and denied benefits.

Jacobson appealed to the Appeals Council of the SSA, adding more medical evidence to the record. The Appeals Council denied the appeal in an order on December 19, 2007. Jacobson then brought this action for judicial review. She argues that the ALJ failed to fully develop the

record and made erroneous findings about her impairments and her ability to work. The parties now move for summary judgment.

## I.    BACKGROUND

### A.    Prior to Onset:  April 2004 – April 2005

Although the available medical record stretched back to February 2004, the first material events occurred in April 2004, about one year before Jacobson alleges her disability began. (*See* Tr. at 153.)  In this period, the only relevant events are a few intermittent visits by Jacobson to her personal care physician, Dr. Stephen Claypool.

At a visit on April 19, 2004, Jacobson discussed her recovery from an auto accident.  She mentioned that she suffered pain during some activities, such as vacuuming or shoveling snow. (Tr. at 291.)  At another visit on October 21, 2004, Jacobson reported back pain due to exertion at work.  Claypool found that the pain was improving and did not direct further treatment.  (Tr. at 286-87.)

At her next visit on March 10, 2005, Jacobson reported chronic headaches and neck pain, stating that the pain was caused by an injury at work.  In his exam notes, Claypool found that the pain had improved with stretching exercises, but noted that this pain might be worsened by one of her tasks at work, which required her to push a heavy cart with 300 medical files.  He also determined that the headache was exacerbated by anxiety.  (Tr. at 286-87.)  That same day, Claypool also wrote a brief work limitation note that said, "Ms. Jacobson should avoid heavy lifting, pushing heavy carts and repetitive resistance motions."  (Tr. at 212.)

As the notes from the March 10 visit indicate, there appears to have been some concerns about Jacobson's ability to perform certain tasks at work.  As a result, a human resources worker

from Jacobson's employer asked Claypool for an assessment of Jacobson's work restrictions. By a letter on March 24, 2005, Claypool answered in relevant part,

> Ms. Jacobson should try to avoid activities that significantly exacerbate her pain. The list of activities is not completely predictable from a physician's perspective; Ms. Jacobson is likely the best judge of what activities cause her an increase in pain. It is, therefore, my suggestion that the employer and employee work together to find the most appropriate job description to meet both their needs. If you require very specific restrictions and details, then I suggest Ms. Jacobson follow up with a physical medicine rehabilitation physician who is an expert in this field.

(Tr. at 288.)

## B. From Onset to the Application: April 2005 – June 2006

Jacobson received an occupational assessment from an occupational therapy specialist on April 8, 2005. After testing, the specialist found that Jacobson had limited strength and range of motion in her trunk, shoulders, and upper spine. The specialist concluded that Jacobson should rarely lift fifteen pounds from the floor, or ten pounds from her waist to her head. The specialist also determined that Jacobson could push or pull about twenty-five pounds frequently and about fifteen pounds continuously. (Tr. at 213-15.)

For reasons that are not fully explored by the record, Jacobson ended her employment shortly thereafter. She did not seek any further medical attention, in connection with her claimed impairments, until October 2005. (*See* Tr. at 106, 284-85.)

On referral from Claypool, Jacobson visited Dr. Peter Daly, an orthopedist, on October 25, 2005. Daly noted that she had an intermittent history of fibromyalgia-type pain in her chest. During examination, Daly found that Jacobson had good strength in her shoulders, but also bursitis and "impingement," leading him to question whether she might have problems with her rotator cuff. He also found chest wall pain and attributed it to fibromyalgia. Daly ultimately

proposed radiological scans, to rule out certain problems in the shoulders, followed by physical therapy and possible steroid injections. The scans confirmed bursitis and tendonitis, but did not reveal any other problems. (Tr. at 253-56, 258-61, 306.)

At the direction of Daly, Jacobson began physical therapy in January 2006. (Tr. at 237, 283.) In a self-reported form, she disclosed that her leisure activities included walks, crafts, and fishing. She also indicated she was taking zanaflex—a muscle relaxant—and acetaminophen to control her pain. (Tr. at 240.) In the initial session, the physical therapist examined Jacobson and found some pain, tenderness, and limited range of motion in the shoulders. (Tr. at 243-44.)

When Jacobson next visited Claypool on January 12, 2006, they discussed treatment options for her shoulder. Because the physical therapist had recommended a steroid cream, they discussed it first. In the exam notes Claypool observed, "I think [Jacobson] would be interested in the steroid injection more in the future if conservative treatment with physical therapy did not work." Claypool then suggested ibuprofen. Jacobson responded that this medication upset her stomach, and Claypool suggested that she take an increased amount of an antiulcer medication to resolve this problem. (Tr. at 282.)

At that visit, Jacobson also asked Claypool to write a note regarding her ability to work. The note states in relevant part,

> [Jacobson] believes that she is best able to tell what degrees of physical exercise she can do without symptoms and I agree with that, that her symptoms are likely one of the best indicators of her ability to perform labor. For example, I expect she should not do a position where is it required that her head be forward or back for extended periods of time. She should not do any heavy lifting. She should not regularly lift weights greater than ten pounds. She should not do repetitive motions with significant abduction of the arms. She can occasionally push heavier objects but should not do it routinely.

(Tr. at 282.)

During this time, Jacobson also reported pain while menstruating.  In the ensuing months, she visited various gynecologists.  They found some concerns with her uterus, but no particular course of treatment was pursued at the time.  (Tr. at 202-03, 248-29, 281, 301-02, 355.)

Jacobson returned to Daly on January 26, 2006.  She said that her shoulder had improved with exercise and physical therapy, but also added that she was now suffering from lower back, hip and thigh pain.  Daly examined Jacobson and found similar strength and range of motion as at the previous October 2005 visit.  He proposed a scan of her lumbar spine, to rule out whether it was causing some of Jacobson's pain, and proposed that she receive steroid medication for her shoulders.  (Tr. at 266-68.)  The ensuing scan showed that her lumbar spine was normal, except for some loss of hydration in certain discs.  (Tr. at 269.)

The physical therapy reached an impasse in March 2006.  At this point, Jacobson told the physical therapist that she was no better than when therapy started in January, and she cancelled all remaining sessions.  (Tr. at 228, 233.)

Jacobson visited Daly again on May 4, 2006.  In addition to examining Jacobson, Daly also conducted an occupational assessment.  He noted in relevant part,

> No apparent pain behavior during the history and with her moving about the exam room.
>
>         . . . .
>
> Could continue working within the . . . restrictions outlined in the April 8, 2005, occupational therapy functional assessment. . . .  I do not see any reason why we could not continue to use those prior restrictions as a guideline for further employment activities. . . .  I do not find anything objectively wrong that I can address specific treatment toward.

(Tr. at 271-72.)

Jacobson visited Claypool again on May 22, 2006. She discussed her pain, including the pelvic pain she was reporting to her gynecologists, and reported headache for the first time in over a year. She again said she was concerned about taking analgesics, due to upset stomach, and rejected either hormone therapy or surgery to resolve the pelvic pain. Claypool evidently did not conduct a complete exam. He generally attributed the pain to fibromyalgia and chronic pain disorder, and in addition to other previously reported pain, noted for the first time that Jacobson was suffering from chronic headache. Claypool did not pursue any new treatment regimen, and instead renewed his suggestion that Jacobson take ibuprofen, with antiulcer medication to mitigate upset stomach. (Tr. at 579.)

Jacobson filed her claim for disability benefits with the SSA on June 30, 2006. Among other impairments, she claimed that she was suffering from chronic pain and fatigue, caused by fibromyalgia. She reported that she was taking zanaflex and acetaminophen to manage her pain. (Tr. at 156, 163.)

**C.     From the Application to the Hearing:  July 2006 – April 2007**

Jacobson next visited Claypool on July 20, 2006. The exam notes generally reiterated the prior history of pain, and Claypool again found that Jacobson was suffering from "anxiousness." Perhaps for this reason, Claypool also mentioned that Jacobson might be seeing a psychologist. Claypool separately noted that Jacobson was starting pool therapy and a home exercise program. (Tr. at 320.)

For her pending disability benefits claim, Jacobson submitted a report to the SSA on July 28, 2006. In addition to severe joint pain, she reported that she suffered from nausea, fatigue, insomnia, and numbness. As a result of these conditions, Jacobson explained, she was unable to

do more than read, watch television, run brief errands, and prepare basic meals. She also stated that she sometimes could walk up to fifteen minutes each day. (Tr. at 166, 171-173.)

Jacobson visited Claypool again on August 31, 2006. At this visit, Jacobson reported that she could walk up to fifteen minutes for two or three times a day. She was also continuing pool therapy but indicated that the coldness of the water worsened her symptoms. After reviewing the symptoms, Claypool suggested that Jacobson try another analgesic or an antidepressant, but she again expressed her reluctance to take medication. (Tr. at 389.)

That same day, Claypool completed an RFC report for Jacobson. He diagnosed her with chronic pain and headache, caused by fibromyalgia and shoulder tendonitis, and also determined that these conditions were exacerbated by anxiety. Claypool opined that, because of the pain and anxiety, Jacobson did not have sufficient attention or concentration to perform even low stress jobs. Claypool also found that Jacobson should rarely lift less than ten pounds; that she should rarely move her neck; and that she could not walk for more than fifteen minutes. (Tr. at 451.)

Jacobson commenced treatment with a pain specialist, Dr. Alfred Clavel, on October 16, 2006. She reported chronic pain and sleeplessness. On examination, Clavel found that Jacobson had tenderness and tightness throughout her neck and shoulders, with decreased range of motion in her shoulders. Clavel diagnosed Jacobson with chronic pain syndrome, consistent with fibro-myalgia, and shoulder tendonitis. He also found hypervigilance, unusually heightened sensitivity to stimuli. Clavel proposed a regimen of home exercise and physical therapy, as well as course of therapy with a health psychologist to redress the hypervigilance and to assist with relaxation. (Tr. at 396-97.)

In the exam notes from the October 16 visit, Clavel implied that Jacobson might not be interested in pursuing treatment. He wrote, "It is unclear to me how motivated she will [be] to

engage in treatment and make changes, only time will tell." Jacobson discovered the statement and challenged it, prompting Clavel to add a supplemental note on November 27, 2006. He added, "[Jacobson] did not feel that [the October 16] statement accurately represented her true motivation." (Tr. at 397.)

After several months without apparent concerns, Jacobson reported more gynecological pain around this time. She ultimately decided upon a partial hysterectomy, which was performed on November 6, 2006. (Tr. at 451.) At an ensuing appointment with Claypool two months later, Jacobson reported that her abdominal pain had decreased. The ensuing record does not disclose further gynecological pain. (*See* Tr. at 447, 506.)

By referral from Clavel, Jacobson visited Dr. Georgia Panopoulos, a health psychologist, on November 15, 2006. Jacobson reviewed her pain symptoms and also reported insomnia. She added that, because of her pain, she was unable to participate in pool therapy or physical therapy. Panopoulos found that Jacobson was cooperative, that she had no problems with concentration, and that she reliably reported her symptoms. Panopoulos concluded that Jacobson had pain disorder and anxiety, and thus proposed ongoing therapy. (Tr. at 432-33.)

Jacobson restarted physical therapy in February 2007. The physical therapists observed many of the same symptoms as the physicians, including pain and limited range of motion in the neck and shoulders. (Tr. at 436-42.)

### D.     The Evidentiary Hearing and the ALJ's Decision

The evidentiary hearing took place before the ALJ on April 25, 2007. Jacobson testified that she suffered from fatigue and constant pain throughout her body. She said that she tried to exercise three times a week, but she only did so once or twice a week, for around ten minutes at a time. She said that she could provide basic care for herself, including some meals and cleaning,

and otherwise wrote e-mail, ran brief errands, and watched television. (Tr. at 26-30, 36.) Her spouse offered similar testimony, noting that they rarely went out, aside from occasional walks or fishing trips. (Tr. at 39.)

The ALJ also received testimony from two experts. The first was Dr. Karen Butler, a psychologist, who testified regarding Jacobson's mental health. Butler reviewed the medical records, but she had not personally examined Jacobson. After noting that Jacobson had been diagnosed with anxiety, Butler concluded that the medical records lacked any proof of mental health symptoms. (Tr. at 43-44.)

The other expert was David Russell, a vocational expert. The ALJ posed a hypothetical where a person could lift twenty pounds occasionally and ten pounds frequently, with postural limitations including no over-the-shoulder tasks, and could otherwise work at a low to moderate pace. Russell opined that, if such a person had past relevant experience as a filing, billing, or general office clerk, that person could perform those jobs. (Tr. at 44-45.)

In the ensuing decision of June 4, 2007, the ALJ determined that Jacobson had several severe impairments, including chronic pain, fibromyalgia, shoulder tendonitis, and anxiety. The ALJ went on to consider how these impairments affected Jacobson's ability to work, focusing in particular on the effects of the pain. (Tr. at 15, 19-20.)

Consistent with what Jacobson had claimed, the ALJ found that Jacobson suffered some pain, but that this pain was not enough to prevent her from working. In part, the ALJ noted that before Jacobson applied for benefits, she performed household work such as cooking, cleaning, and mowing the lawn. (Tr. at 17.) The ALJ also reviewed the extent of treatment that Jacobson had received for pain and concluded,

> The claimant's treatment is conservative and consists primarily of over-the-counter medication with no reported side-effects and

> physical therapy. She does not require strong narcotic medication. Such as limited course of treatment is not persuasive of total disability. As the claimant did not take any steps to obtain different medications, the undersigned may reasonably infer the claimant was satisfied with the effects of the present medications.

(Tr. at 19-20.)

The ALJ also devoted significant analysis to Jacobson's ability to work. In the course of this analysis, the ALJ gave mixed weight to evidence from Claypool. The ALJ favorably cited Claypool's note from March 10, 2005, where he found that Jacobson should avoid "heavy lifting, pushing heavy carts and repetitive resistance motions." But the ALJ rejected Claypool's RFC assessment from August 31, 2006, in which he found that Jacobson could rarely lift weights under ten pounds; the ALJ found this limitation was inconsistent with Jacobson's other daily activities. (Tr. at 19.)

Because Claypool was not a mental health specialist, the ALJ also discounted Claypool's opinions about Jacobson's stress and anxiety. The ALJ instead cited Bulter's opinion, finding that Jacobson did not have mental impairments that affected her ability to work. (Tr. at 19.)

The ALJ also briefly discussed evidence from Clavel, finding that Clavel only prescribed exercise, physical therapy, and psychotherapy. And the ALJ observed that, according to Clavel, Jacobson had questionable interest in engaging with treatment. (Tr. at 19.)

When determining the extent of Jacobson's ability to work, the ALJ largely relied on the April 8, 2005 occupational therapy assessment. So the ALJ found that Jacobson could lift fifteen pounds and carry twenty-five pounds, but not perform overhead work. The ALJ then went on to review many the symptoms Daly observed during his treatment of Jacobson, implying that the April 8 assessment and Daly's subsequent diagnoses corroborated one another. (Tr. at 18.)

From the limitations in the April 8 assessment, the ALJ found that Jacobson was capable of a modified form of sedentary work. Because these limitations were largely consistent with the hypothetical he posed to Russell, the vocational expert, the ALJ concluded that Jacobson could perform some of her past relevant work as a filing, billing, or general office clerk. The ALJ thus decided that Jacobson was not disabled. (Tr. at 20-21.)

**E. After the Decision: June 2007 – September 2007**

Upon learning of this decision, Jacobson solicited more information from her physicians, in an effort to bolster her proof of disability. On its review, the Appeals Council considered this evidence; without further comment, it denied the appeal and affirmed the decision by the ALJ. (Tr. at 1, 4.)

Claypool completed an RFC assessment on June 14, 2007. He found that Jacobson was unable to sit or stand for more than minutes at a time, and that she was wholly unable to engage in any manual or postural tasks. Claypool further determined that, due to anxiety and depression, Jacobson could not handle any degree of workplace stress. As a result, Claypool concluded that Jacobson could not work whatsoever. (Tr. at 535-36.) In a letter that same day, Claypool made similar statements. (Tr. at 537.)

Clavel completed two separate RFC assessments on September 17, 2007, focusing on headache and fibromyalgia. He found that Jacobson suffered from headaches constantly, which caused pain, vertigo, and exhaustion. Clavel also found that Jacobson had tenderness and limited range of motion consistent with fibromyalgia, which caused her to feel pain throughout her body. He opined that Jacobson could walk six to eight blocks without resting; she could sit or stand for twenty minutes at a time, and no more than two hours of an eight-hour workday; and she had

postural limitations but no difficulties with manual tasks. Between these physical limits and her ongoing pain, Clavel also concluded that Jacobson was fully unable to work. (Tr. at 629-32.)

Panopoulos completed an RFC assessment on September 21, 2007, diagnosing Jacobson with depression, but finding no problems with concentration or social functioning. Other than determining that Jacobson would miss work more than four days per month, Panopoulos did not identify other problems that would interfere with Jacobson's ability to work. (Tr. at 635-37.)

## II.    ANALYSIS

Through her motion for summary judgment, Jacobson principally argues that the ALJ did not fully develop the record and made erroneous findings about her impairments and ability to work. In his cross motion, the Commissioner responds that the rulings of the ALJ are supported by substantial evidence. This Court will begin by looking at the scope of the record, and then turn to whether that record supports the findings of the ALJ.

### A.    Development of the Record

Jacobson initially argues that the ALJ did not fully develop the record before issuing the decision, and therefore, the ALJ was obligated to solicit RFC questionnaires from her treating physicians.

When seeking disability benefits, a claimant carries the burden to prove the existence of impairments that prevent the claimant from working. But even though this burden is borne by the claimant, the ALJ is still obligated to fairly develop enough of a record to make an informed decision. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

There is no particular standard for evaluating whether the ALJ has sufficiently developed the record. So when considering this issue, a reviewing court instead evaluates the record on a case-by-case basis. *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008); *Gregg v. Barnhart*, 354

F.3d 710, 712 (8th Cir. 2003) (quoting *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994)). The underlying question, when assessing the record, is whether the ALJ received enough evidence to decide all "crucial issues." *Eichelberger v. Barnhart*, 390 F.3d 584, 591-92 (8th Cir. 2004); *Stormo*, 377 F.3d at 806.

Where the record lacks any indication that treating physicians evaluated the claimant's ability to work, or where the evidence from those physicians is vague or based on unacceptable diagnostic techniques, an ALJ may have a duty to further develop the record. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005); *see also Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (concluding that, where claimant had several severe impairments but treating physicians did not assess claimant's ability to work, the ALJ did not sufficiently develop the record).

By comparison, if several physicians have provided detailed data and observations about the claimant, the crucial issues are likely to be developed. *Stormo*, 377 F.3d at 806. And where the decision of the ALJ is not based on a lack of evidence, but instead resolves inconsistencies in the medical records, the ALJ has no obligation to seek more evidence from treating physicians. *Goff*, 421 F.3d at 791.

As illustrated by this Court's prior recitation of the factual background, the ALJ received voluminous medical records. They show that several physicians examined Jacobson and, in the course of treatment, performed a range of diagnostic tests. These records provide an extensive narrative about all of the claimed impairments at issue here.

At the time of the hearing before the ALJ, the record included five express assessments from treating physicians regarding Jacobson's ability to work. And the ALJ also resolved certain inconsistencies between various physicians' assessments and other medical records. Under these

circumstances, the record was amply developed on all crucial issues, and the ALJ had no duty to further develop the record or solicit more evidence from treating physicians.

### B. Substantial Evidence Review

Jacobson also argues that the ALJ did not adequately examine the record before deciding the case, and moreover, made erroneous findings. The Commissioner counters that the findings of the ALJ are supported by substantial evidence.

On review of the decision of an ALJ regarding social security benefits, a court examines whether the findings of the ALJ are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Scott ex rel. Scott v. Astrue*, 529 F.2d 818, 821 (8th Cir. 2008). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quotation omitted).

When assessing whether there is substantial evidence, a court must consider evidence that supports, and that which contradicts, the factual findings of the ALJ. *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004). Those findings are not subject to reversal just because substantial evidence may also support another outcome. If it is possible to draw differing conclusions from the record, but one of those conclusions supports the findings by the ALJ, those findings must be affirmed. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).[1]

This Court further observes that, after the ALJ issued the decision, Jacobson submitted extra evidence to the Appeals Council. In these circumstances, a court must consider the record as supplemented, and then decide whether the ALJ would reach the same decision on the basis of

---

[1] Although both parties acknowledge that substantial evidence is the appropriate standard of review here, Jacobson implies that this Court should also consider whether the ALJ properly considered the record. Assuming it is even possible to review the decision of the ALJ this way, the authorities require a different standard of review. This Court must instead focus on whether the findings of the ALJ are supported by substantial evidence.

substantial evidence. This approach is problematic, as it requires a reviewing court to speculate about the findings an ALJ would make on the expanded record, but it is the controlling rule here. *Van Vickle v. Astrue*, 539 F.3d 825, 828 & n. 2 (8th Cir. 2008).

Through her motion, Jacobson challenges several particular findings by the ALJ. The challenges may be described as follows:

- The ALJ gave undue weight to the occupational therapy assessment from April 2005.

- The ALJ failed to recognize that, because Jacobson cannot maintain any position for a significant period of time, she is unemployable.

- The ALJ improperly rejected the opinions of her treating physicians regarding how workplace stress would affect her pain.

- Because of erroneous findings regarding Jacobson's work history and her use of medications, the ALJ improperly discounted Jacobson's credibility.

- The ALJ failed to give sufficient weight to Jacobson's subjective reports of pain.

These arguments may be framed into three areas. Jacobson essentially asserts that (1) the ALJ did not give sufficient weight to evidence from her treating physicians; (2) the ALJ improperly discounted her testimony and her subjective complaints of pain; and (3) the ALJ did not have substantial evidence to support the findings about Jacobson's ability to work. This Court will address each in turn.

### 1. Evidence from Treating Physicians

Jacobson raises several questions regarding whether the ALJ gave sufficient weight to the evidence from her treating physicians. In particular, she focuses on evidence from Claypool, her primary care physician; Clavel, the pain specialist; and Panopoulos, the health psychologist. The

Commissioner acknowledges that opinions of treating physicians are entitled to some deference, but argues there is reason to discount or reject those opinions here.

The rule is that opinions from a treating or examining physician are entitled to substantial weight. But such opinions do not have conclusive weight and must be supported by acceptable clinical or diagnostic data. *Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).

There are several scenarios where an ALJ may properly give less weight to the opinions of a treating physician. For instance, it may receive less weight where it is contradicted by the physician's own findings elsewhere in the record, *Gonzales v. Barnhart*, 465 F.3d 890, 896 (8th Cir. 2006), or by other evidence of the claimant's activities, *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). Less weight may also be proper if a general practitioner proposes narrower limitations than a qualified specialist. *Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006).

### a. Claypool

Regarding the evidence from Claypool, the record shows that he frequently opined about Jacobson's ability to work. In a note on March 10, 2005, he found that Jacobson should avoid heavy lifting or pushing and other repetitive motions. Yet through a letter on May 24, 2005, he declined to provide specific restrictions, saying that Jacobson should "follow up with a physical medicine rehabilitation physician who is an expert."

Claypool did not issue another assessment until August 31, 2006. During a visit that day, Jacobson reported that she could walk up to fifteen minutes two or three times a day. But in an RFC questionnaire that same day, Claypool determined that Jacobson could not walk more than fifteen minutes per day. Claypool further found that Jacobson could rarely move her neck or lift weights less than ten pounds. Because her pain was worsened by anxiety, Claypool opined, she could not perform even low stress jobs.

Claypool completed his next assessment on June 14, 2007, after the ALJ had issued the decision. This assessment was more stringent than the one from August 2006. Claypool found that Jacobson could not do any manual or postural tasks, and because of anxiety and depression, she could not tolerate any degree of stress.

The record has minimal clinical data to support either the August 2006 or June 2007 assessments. Though Claypool frequently examined Jacobson, he made few observations about her ability to tolerate exercise or perform certain tasks. More significantly, the August 2006 assessment placed more significant limits on Jacobson's ability to walk than Jacobson herself reported earlier that day. And in the May 2005 letter, Claypool essentially discounted his own ability to assess the vocational limitations of his patients.

In the August 2006 and June 2007 assessments, Claypool also offered opinions that were far narrower than the contemporaneous opinions of the other specialists involved in Jacobson's treatment. This is equally true for the physical impairments and the mental impairments.

For the physical impairments, the orthopedist, Daly, found on May 4, 2006 that Jacobson was exhibiting no pain behavior. He adopted the limitations in the April 8, 2005 occupational assessment, agreeing that Jacobson could rarely lift between ten and fifteen pounds and could frequently push or pull about fifteen pounds. And in an assessment on September 17, 2007, the pain specialist, Clavel, determined that Jacobson could perform manual tasks and could walk six to eight blocks without resting.

Regarding the mental impairments, the psychologists also reached opinions that were not wholly consistent with Claypool's. The testifying expert, Butler, noted that Jacobson had been diagnosed with anxiety but that there was no proof of this impairment. And though Panopoulos initially diagnosed Jacobson with anxiety in November 2006, she only found depression in her

ensuing assessment of September 21, 2007. Panopoulos further found that, other than missing work, this disorder did not impair Jacobson's concentration or social functioning.

What the record reveals, therefore, is that Claypool had a minimal basis for his opinions; that he even called into question his own ability to make an occupational assessment; and that he often contradicted the opinions of specialists. From this record, the ALJ had substantial evidence on which to appropriately discount the opinions from Claypool.

Though the ALJ did not have the benefit of Claypool's June 2007 assessment, it does not disturb the analysis here. The assessment finds severe limitations, more so than the August 2006 assessment, yet the underlying medical records do not show how Jacobson's condition materially worsened in the time between the assessments. And other opinions from specializing physicians, including their assessments since the ALJ's decision, also contradicted much of Claypool's June 2007 assessment. In the circumstances, the ALJ would not have given the June 2007 assessment any material weight.

### b.    Clavel

The record indicates that Clavel examined Jacobson on October 16, 2006 and, following the ALJ's decision, issued two RFC assessments about Jacobson on September 17, 2007. The record does not say whether Clavel further examined Jacobson or performed particular medical tests.

During the October 2006 examination, Clavel found pain incident to fibromyalgia and shoulder tendonitis, as well as tightness, tenderness, and limited range of motion in Jacobson's neck and shoulders. But this record does not show whether Clavel assessed Jacobson's ability to tolerate exercise or to perform postural tasks. Clavel instead recommended that Jacobson begin

a regimen of physical therapy, but Clavel questioned whether Jacobson would be motivated to participate.

The ALJ relied in part on this evidence. Because Clavel recommended physical therapy, the ALJ inferred that Jacobson could tolerate some level of exercise. Because Clavel questioned Jacobson's motivation, moreover, the ALJ also inferred that Jacobson was capable of a greater level of exertion than she had reported. These inferences are reasonable, and when making them, the ALJ did not discount any evidence from Clavel.

As noted earlier, Clavel also issued two RFC assessments in September 2007, after the ALJ's decision. Clavel found that Jacobson could walk six to eight blocks without resting; could sit or stand twenty minutes at a time and no more than two hours of an eight-hour workday; and had limitations on certain postural tasks. The question accordingly becomes whether the ALJ would have credited or discounted this evidence, and in addition, whether such evidence would have altered the original decision.

Based on the October 2006 examination, Clavel had some objective basis for his opinion on the postural limitations. But this examination did not necessarily support Clavel's opinions about sitting, standing, or exertional limitations.

In particular, the record has limited evidence describing how Jacobson fared in the time between Clavel's initial examination and his subsequent assessment. In this period, Jacobson visited Claypool intermittently. But the records from those visits are not entirely consistent with the profound limitations that Clavel reported in the September 2007 assessment.

As a result, many conclusions in Clavel's September 2007 assessment are not founded on acceptable clinical data, and the ALJ would have had ample cause to discount that assessment.

This Court thus concludes that, even if the ALJ had examined the assessment, the ALJ would not have made materially different findings here.

### c.      Panopoulos

The record shows that Panopoulos examined Jacobson once on November 15, 2006, and following the ALJ's decision, Panopoulos issued an RFC assessment for Jacobson on September 21, 2007.  Like with Clavel, the record does not say whether Jacobson visited Panopoulos during the period between the initial visit and the ensuing assessment.

From their November 2006 visit, Panopoulos determined that Jacobson had anxiety and pain disorder.  Notwithstanding this diagnosis, Panopoulos found that Jacobson was cooperative and had no difficulty concentrating.  Aside from these observations, Panopoulos did not note any particular limitations on Jacobson's ability to work.

The ALJ's decision did not mention that Jacobson received treatment from Panopoulos. This omission would ordinarily be troubling, as the ALJ must typically accord substantial weight to the opinions of a treating professional, and if not, give reasons for doing so.  But in the current circumstances, this omission is not cause for concern.  Jacobson only visited Panopoulos once, and the evidence from that visit does not suggest any discrete limitations on Jacobson's ability to work.  So if there was any error by the ALJ, it was harmless.

Panopoulos issued the RFC assessment on September 21, 2007.  This time Panopoulos diagnosed Jacobson with depression.  Other that finding that Jacobson would miss work four or more days a month, Panopoulos did not identify other limitations on Jacobson's ability to work.

The ALJ likely would have discounted this assessment.  To begin with, the record shows that Jacobson only visited Panopoulos once, and thus Panopoulos had little clinical or diagnostic data to support her opinion.  More significantly, Panopoulos did not specify particular limitations

on Jacobson's ability to work, and evidently lacked a basis for finding that Jacobson would miss work at least four times a month. The September 21 assessment also finds depression, contrary to the diagnosis of anxiety at the prior November 15 visit.

Like with Clavel, the ALJ would have had cause to discount evidence from Panopoulos. This evidence, therefore, would not have materially altered the outcome here.

## 2. Credibility of the Claimant; Subjective Reports of Pain

Jacobson also contends that the ALJ improperly discounted her credibility. The question here is whether the ALJ had cause to do so.

The best starting point for this discussion is the five-factor testing that the Eighth Circuit adopted in *Polaski v. Heckler*. 739 F.2d 1320, 1322 (8th Cir. 1984) (favorably citing 20 C.F.R. § 404.1529(c)(3)). Though this standard has chiefly been used to evaluate subjective complaints of pain, courts have since used it for other subjective complaints. *See, e.g., Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007); *Dukes v. Barnhart*, 436 F.3d 923, 927-28 (8th Cir. 2006).

An ALJ need not explicitly cite or discuss *Polaski* so long as the decision shows that the ALJ considered all the factors. These factors include, but are not limited to, the claimant's daily activities; the duration, intensity, and severity of pain; precipitating and aggravating factors; the dosage and effectiveness of medication; and whether the pain results in functional restrictions. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

Even if the ALJ does not address these factors in depth, it is proper to defer to the ALJ's ruling on the credibility of the claimant, so long as there is good reason for that ruling. And if a claimant alleges certain limitations, but does not seek treatment and engages in activities that are otherwise inconsistent with the limitations, there is substantial evidence for the ALJ to find that the claimant was not entirely credible. *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

At the April 25, 2007 hearing, Jacobson testified that she suffered from constant pain and fatigue. She added that she could provide some care for herself, and perform a few household tasks, but that she could not exercise more than once or twice per week.

The ALJ gave this testimony limited weight, finding that Jacobson suffered from pain but that this pain was not enough to prevent her from working. In material part, the ALJ found that Jacobson had performed a wide range of tasks, including cooking, cleaning, answering e-mails, and mowing the lawn. The ALJ also noted that Jacobson was receiving conservative treatment for her pain, consisting of non-narcotic medications and physical therapy, and therefore inferred that Jacobson's pain was less severe. And because of Clavel's October 16, 2006 exam note, the ALJ also questioned whether Jacobson was motivated to rehabilitate and work.

Regarding daily activities, the record shows that in January 2006, Jacobson reported that her leisure activities included walks, crafts, and fishing. After she applied for disability benefits, in July 2006, Jacobson reported that she could only read, watch television, run brief errands, and prepare basic meals. Her ensuing testimony was consistent with the latter report.

Elsewhere in the record, however, are indications that Jacobson could engage in a higher level of activity. In April 2004, Jacobson mentioned to Claypool that she was shoveling snow. Her orthopedist, Daly, found in May 2006 that Jacobson was not manifesting pain and was able to work with some restrictions. And though Jacobson reported much harsher symptoms after she applied for disability benefits, the medical records during that period do not necessarily support this trend.

Some evidence, including the testimony from Jacobson, indicates that she was unable to engage in much activity whatsoever. But other evidence, including some reports from Jacobson herself, reasonably support a finding that Jacobson was able to engage in more activity. This is

further bolstered by the observation, from Clavel at the October 2007 exam, that Jacobson may not have been motivated to do more. As the record supports more than one reasonable outcome, it is enough to supply substantial evidence for the findings by the ALJ.

Regarding the frequency, intensity, and impact of pain, the record shows that Jacobson frequently reported pain. As a practical means to assess these issues, the ALJ focused the scope of medication and treatment.

The record indicates that, since the alleged onset of her disability, Jacobson managed her pain by taking acetaminophen and a muscle relaxant. When Jacobson reported that her pain was worse, Claypool repeatedly proposed that she take ibuprofen with an antiulcer medication, but Jacobson apparently never tried this. Claypool then proposed an antidepressant and a different analgesic, which Jacobson evidently refused. Daly apparently proposed steroids, to no avail, and Clavel did not propose any adjustments to the medications. But both Daly and Clavel called for exercise and physical therapy.

The ALJ characterized this treatment as conservative. Because Jacobson was not taking more potent medications, and because her treatment otherwise consisted of physical therapy, the ALJ determined that her pain was less severe. This inference is reasonable. In particular, when the specialists directed Jacobson to exercise and participate in physical therapy, they implied that Jacobson was able to tolerate some exercise and was capable of rehabilitation.

Although the ALJ did not expressly cite *Polaski*, the ALJ duly considered all the relevant factors, including the extent of Jacobson's daily activities and the impact of her pain. There was evidence showing that, notwithstanding her testimony, Jacobson could engage in more intensive activity than she claimed. And as her treatment was relatively conservative, it was also possible

to infer that her pain was not as severe as reported.  As a result, when the ALJ found Jacobson's reports and testimony less credible, these findings were supported by substantial evidence.

Jacobson devotes much argument to the issues surrounding medication.  Because she is allergic to more potent medications, she contends, her resistance to them was reasonable.  Due to a prior gastric bypass, Jacobson explains, most pain medications upset her stomach.

These claims, however, are not fully borne out by the record.  It shows that Jacobson is allergic to narcotics, but not other pain medications.  And there is no indication Jacobson tried other medications and reported side effects.  Moreover, Claypool repeatedly proposed mitigating stomach upset with antiulcer medication, yet Jacobson did not try this.  In light of this resistance, the ALJ could reasonably find that other pain management strategies remained open to Jacobson.

To support her position, Jacobson cites an Eighth Circuit decision, *Kisling v. Chater*.  105 F.3d 1255 (8th Cir. 1997).  She contends that, for an ALJ to make adverse findings on whether a claimant is amenable to medication, the ALJ must make specific findings.  These include that medication was actually prescribed to the claimant; that the claimant had no justification to deny this medication; and that such medication will actually make it possible for the claimant to return to work.  (Def.'s Mem. at 20.)

This rule, however, is not supported by *Kisling*.  It stands for the principle that, where a claimant fails to follow a course of treatment for an otherwise disabling impairment, and there is no good cause for this failure, the ALJ has reason to deny disability benefits.  *Id.* at 1257.  But in the current litigation, the ALJ did not deny disability benefits for this reason.  The ALJ instead inferred that, because Jacobson was not taking more potent medication, her pain was less severe and caused fewer functional limitations.  This finding does not implicate *Kisling*, and so that case does not influence the analysis here.

### 3. Ability to Work; Modified Residual Functional Capacity

Jacobson also challenges the ALJ's findings regarding her residual functional capacity (RFC), or in more practical terms, the findings about her ability to work. Briefly put, the ALJ found that Jacobson could lift twenty pounds occasionally and ten pounds frequently, with some postural limitations, and could work at a low to moderate pace. Jacobson argues these findings are not supported by the record and are contradicted by assessments from her treating physicians.

As discussed at length beforehand, the ALJ had reason to discount the assessments from Clavel, Claypool, and Panopoulos. The limitations the ALJ did find are reasonably supported by the occupational assessment from March 24, 2005, as adopted by Daly over a year later, on May 4, 2006. And these assessments are consistent with the pain and limited range of motion found by her various treating physicians. Substantial evidence supports these findings.

Jacobson suggests, in part, that the ALJ did not adequately consider her mental health or her gynecological concerns. Regarding the mental health issues, the ALJ had cause to discount the opinions from both Claypool and Panopoulos. And another medical expert, Butler, found no proof of any mental health symptoms. More importantly, the record lacks any reliable evidence to illustrate the impact of Jacobson's purported mental impairments on her ability to work. The findings of the ALJ, in this respect, are supported by substantial evidence.

Turning to the gynecological concerns, the record indicates that Jacobson had suffered pain while menstruating. Though her gynecologists did not pursue any particular treatment, this pain became increasingly severe in 2006. But this issue was apparently resolved when Jacobson received a partial hysterectomy in December 2006. The record does not otherwise say how the gynecological concerns affected Jacobson's ability to work, and in light of the hysterectomy, the

ALJ had reason to give less attention to gynecological issue. Even if the ALJ committed error by failing to address these issues, the purported error is harmless.

Jacobson also contends that the ALJ mischaracterized her RFC. According to Jacobson, she can only perform jobs that allow her to frequently shift position. But under the SSA's RFC classification for sedentary work, Jacobson argues, a person cannot sit or stand at will. Jacobson implies that the ALJ did not make this accommodation, and therefore, the ALJ should not have considered sedentary jobs.

This argument appears misleading, as the ALJ never determined that Jacobson required a job where she could sit or stand at will. The ALJ otherwise had substantial evidence to support the findings on Jacobson's limitations, and there is no reason to revisit those findings here.

An ALJ may find, nevertheless, that a claimant has greater limitations than for ordinary sedentary work. Such limitations do not necessarily prevent employment. As the Commissioner correctly observed, an ALJ may propose narrower limitations and examine whether there remain jobs that satisfy those limitations. *See* Social Security Ruling 96-9p, 1996 WL 374185 at *4-*5 (noting that, where claimant has limitations that exceed those for sedentary work, an ALJ should account for the extent that opportunities for employment are "eroded").

The ALJ here consulted a vocational expert. Through a hypothetical, the ALJ described a person with limitations like Jacobson's. The expert testified that such a person had significant opportunities for employment. The ALJ adopted this testimony and, by doing so, supported the vocational findings with substantial evidence. Jacobson's arguments do not otherwise call these findings into question, and therefore, those arguments are not material here.

## III. CONCLUSION

Jacobson argues that the ALJ did not have reason to discount the opinions of her treating physicians, or her own subjective reports, regarding her impairments. But to the extent the ALJ rejected opinions from Jacobson's treating physicians, those opinions were either inconsistent or unsupported by acceptable clinical evidence. And to the extent that the ALJ rejected subjective reports from Jacobson, her testimony was inconsistent with other evidence that demonstrated her daily activity and the limited scope of her treatment.

The findings of the ALJ were otherwise supported by substantial evidence. This Court accordingly concludes that the decision of the ALJ is properly affirmed and the parties' motions should be decided accordingly. Being advised of all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1. Jacobson's motion for summary judgment (Doc. No. 35) be **DENIED.**

2. The Commissioner's motion for summary judgment (Doc. No. 39) be **GRANTED.**

3. This matter be **DISMISSED WITH PREJUDICE.**

Dated this 20th day of July, 2009.

          s/ *Jeanne J. Graham*
          JEANNE J. GRAHAM
          United States Magistrate Judge

### NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **August 4, 2009**. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.